UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| CHIA DOUA YANG, | Case No. 15-CV-0113 (PJS/FLN) |
| Plaintiff, | |
| v. | ORDER |
| CITY OF BROOKLYN PARK; JEFFREY TOMASZEWSKI; CHRIS DONAHUE; and MARCUS ERICKSON, | |
| Defendants. | |

---

Pao P. Yang for plaintiff.

Brian P. Taylor, Jason M. Hiveley, and Jon K. Iverson, IVERSON REUVERS CONDON, for defendants.

Chia Doua Yang brings this civil-rights action against the City of Brooklyn Park, Minnesota ("Brooklyn Park") and three of its police officers: Detective Jeffrey Thomas,[1] Detective Chris Donahue, and Sergeant Marcus Erickson. Yang was arrested by Brooklyn Park officers for making two bomb threats, one of which had been called in from a phone at a medical clinic. The next day, Detective Thomas watched surveillance video of the caller, discovered that the caller was not Yang, and informed Sergeant Erickson that they had arrested the wrong man. Instead of releasing Yang,

---

[1] Detective Thomas changed his last name from Tomaszewski to Thomas after the events giving rise to this lawsuit.

Sergeant Erickson directed that he be kept in jail another night because he might be *related* to the culprit. In this lawsuit, Yang alleges that his Fourth Amendment rights were violated by both his initial arrest and his continued detention.

This matter is before the Court on defendants' motion for summary judgment. The Court grants defendants' motion as to Yang's claims arising from the initial arrest, but (mostly) denies defendants' motion as to Yang's claims arising from the continued detention.

## I. FACTS

On January 21, 2013, someone called the Brooklyn Park facility of Medtronic, Inc., and made a bomb threat. Police were able to determine that the call came from a telephone at New River Medical Center ("New River") in Monticello, Minnesota. Detective Thomas listened to a recording of the bomb threat and thought that the caller sounded like an Asian male. Officers checked the Medtronic facility and found no explosives.

The next day—January 22, 2013—Medtronic received a similar bomb threat from a different telephone number. The caller sounded like the person who had called the previous day. Again, officers checked the Medtronic building and found no explosives.

Later that afternoon, Detective Thomas met with Troy Eavzan, Medtronic's senior security director, and Jennifer Johnson, Medtronic's human-resources director.

Johnson told Detective Thomas that, three days earlier, Medtronic had terminated the long-term disability benefits of a former employee named Chia Yang. Yang began working for Medtronic in 2002. He stopped working after becoming disabled, and he received disability benefits for about six months before those benefits were terminated.

Johnson listened to a recording of one of the threats. She did not identify the caller as Yang, but suggested that Christenia Ahmed (Yang's former immediate supervisor) may be able to do so. Yang and Ahmed had worked together since 2007 and spoke daily before Yang went on leave. After listening to part of the call four times, Ahmed was not able to identify the caller as Yang.

Johnson then said that, based on having spoken with Yang the previous November, she was confident that he was the caller. She also suggested that Laura Erchul be invited to listen to the recording of the bomb threat; Erchul was a human-resources representative who had recently spoken with Yang about his disability benefits. Erchul listened to the recording once via telephone and said, "I think I have a pretty good idea of who that might be." She then listened a second time and said, "That's Chia Yang."

While Detective Thomas was meeting with Medtronic employees, Detective Donahue was meeting with Mary Lanegren, a facility manager at New River. Detective Donahue showed Lanegren a photograph of Yang. Lanegren told Detective Donahue

that she did not recall seeing Yang, and that New River had no record of Yang visiting its facility on January 21.

After meeting with Lanegren, Detective Donahue left New River and returned to Brooklyn Park. Later that afternoon—at 2:50 pm—Lanegren called Detective Donahue and told him that New River had located surveillance video that showed the suspect just before he called in the first bomb threat. Lanegren told Detective Donahue that the caller looked like an Asian man.[2] Lanegren also told Detective Donahue that she was going to email still images from the surveillance video, and that she would later make a copy of the entire video for him. Lanegren then left for the day. Detective Donahue did not receive the promised email.

After Detective Thomas completed his interviews at Medtronic, he went back to his office and spoke with Lieutenant Nelson[3] and Sergeant Erickson. Lieutenant Nelson and Sergeant Erickson both expressed the opinion that there was probable cause to arrest Yang. Detective Thomas prepared a search-warrant application for Yang's home.

---

[2]The record is not clear about precisely what Lanegren told Detective Donahue. Detective Thomas's affidavit says that Detective Donahue told him that New River "staff had video surveillance of the suspect which they believed matched or resembled Yang." Thomas Aff. at 3. Detective Donahue's affidavit, though, says only that Lanegren told him that "she found what appeared to be an Asian male on the surveillance video . . . ." Donahue Aff. at 2. Viewing the record in the light most favorable to Yang, the Court assumes that Lanegren told Detective Donahue only that the suspect appeared to be an Asian man and not that he resembled Yang.

[3]Lieutenant Nelson's first name is not in the record.

That application was reviewed by Hennepin County Judge Daniel H. Mabley, who found probable cause and issued a search warrant.

Just before 8:00 pm (still on January 22), Detective Thomas and other Brooklyn Park officers executed the search warrant on Yang's house and arrested him. Officers found no evidence of bomb-making materials. Detective Thomas spoke with Yang's wife, who said that Yang was home on January 21 and 22 and, to her knowledge, had not made any bomb threats. Detective Thomas also spoke with Yang's three sons. None of them knew where their father had been on January 21 or 22. One of the sons said that he rarely spoke to his father and that his father had a short temper.

Detective Thomas read Yang his *Miranda* rights, and Yang gave a voluntary statement. Yang denied knowing about the bomb threats. Yang said that he had nothing against Medtronic, although he was disappointed that the company had cut off his disability benefits. Yang was jailed.

The next day, Detective Donahue went back to New River. Lanegren explained that her email had not been delivered because the attachments were too large. Lanegren then gave Detective Donahue a DVD copy of the surveillance video. Detective Donahue went back to his office and watched the video. He saw that the suspect was an Asian man in his mid-to-late fifties or early sixties.

That evening, Detective Thomas looked at the surveillance video and still shots from the video and concluded that the suspect was not Yang. Detective Thomas alerted Sergeant Erickson that they had arrested the wrong man. Sergeant Erickson told Detective Thomas to keep Yang in custody anyway "because the man in the video could be related to Yang." Thomas Aff. at 4. Sergeant Erickson also instructed Detective Thomas to send the images to Medtronic. Detective Thomas forwarded the images as instructed, and Yang spent a second night in jail.

The next morning, a Medtronic employee phoned Detective Thomas and told him that four Medtronic supervisors had listened to the audio recordings of the calls and looked at the surveillance images and identified the suspect as Andy Truong. Truong had been fired by Medtronic for poor performance and had recently lost his unemployment benefits.

Detective Thomas passed this information along to Sergeant Erickson, and Sergeant Erickson finally ordered that Yang be released. Detective Thomas notified the prosecutor that she should not pursue charges against Yang.

Yang now brings federal and state claims for unlawful arrest and unlawful imprisonment against Brooklyn Park, Detective Thomas, Detective Donahue, and Sergeant Erickson.

II.  ANALYSIS

*A. Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

*B.  Federal Claims*

Yang claims that defendants violated the Fourth Amendment by arresting him without probable cause and by detaining him after they learned from the surveillance video that he had not made the bomb threats.  Defendants move for summary judgment, arguing (among other things) that the officers enjoy qualified immunity.

Qualified immunity protects a police officer from personal liability in a 42 U.S.C. § 1983 action unless the officer's conduct violated a clearly established constitutional or statutory right.  *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012) (citing *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)).  Whether an officer is entitled to

qualified immunity depends on two questions: "'(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" *Id.* at 730-31 (quoting *Brown*, 574 F.3d at 496). The court may address the questions in any order, but the officer will be found immune unless both questions are answered affirmatively. *Id.* at 731 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012)). When a party moves for summary judgment on the ground of qualified immunity, "'[t]he party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences.'" *Id.* at 730 (quoting *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008)).

1. Initial Arrest

As a general matter, the Fourth Amendment requires that a police officer making an arrest have a warrant or probable cause. "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011)).

If a police officer does not, in fact, have probable cause to arrest a suspect, he is nevertheless entitled to qualified immunity if he has "arguable" probable cause—that is, if he reasonably (but wrongly) believes that probable cause exists. "In the wrongful arrest context, officers are entitled to qualified immunity 'if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable.'" *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)).

Given what was known at the time of Yang's arrest, the officers acted reasonably in concluding that the arrest was supported by probable cause. Yang was not a stranger to Medtronic, but had worked for the company for many years. Just two days before the first bomb threat was made, Medtronic had cut off Yang's long-term disability benefits. Two Medtronic employees listened to a recording of one of the bomb threats and told police that the caller was Yang. And Lanegren—a neutral observer who was the only person who had seen both the surveillance video and a photograph of Yang—told officers that the caller appeared to be an Asian man (and did not tell officers that the caller did not appear to be Yang).

Officers also knew that Judge Mabley had issued a search warrant for Yang's home. True, the search warrant was not an arrest warrant. But the fact that officers knew that Judge Mabley had found probable cause to believe that evidence regarding

the bomb threats would be found in Yang's home made it more reasonable for the officers to conclude that there was probable cause to believe that Yang had made the bomb threats.

Yang emphasizes that, according to the Eighth Circuit, ". . . probable cause does not exist when a minimal further investigation would have exonerated the suspect." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (citations and internal quotation marks omitted). Yang argues that "a minimal further investigation" would have exonerated him. Specifically, Yang emphasizes that he was arrested five hours after New River informed Detective Donahue that the culprit had been captured on video. Had an officer simply driven to New River and looked at the video, Yang would have been exonerated—just as he was exonerated when Detective Thomas viewed the video *after* arresting him.

Yang's argument is far from frivolous, but the argument appears to be foreclosed by *Clayborn v. Struebing*, 734 F.3d 807 (8th Cir. 2013). In that case, police officers arrested the plaintiff (Clayborn) for passing a forged $100 bill at a restaurant after two employees identified her as the culprit. *Id.* at 809. Clayborn sued, alleging that the arrest was not supported by probable cause because the officers had failed to conduct "a minimal further investigation" that would have exonerated her. For example, Clayborn argued, officers could have viewed surveillance video. *Id.* The Eighth Circuit

was not convinced. The court held that the identification of Clayborn by the two employees gave officers "(arguable) probable cause to arrest" her—and that, once the officers had arguable probable cause, they "had no duty to conduct further investigation." *Id.*

*Clayborn* is not materially distinguishable from this case. At the time that officers arrested Yang, they had arguable probable cause based on the identification of Yang by two Medtronic employees and based on the other circumstances described above. Thus, the officers had "no duty to conduct further investigation" before arresting Yang. *Id.*

The Court also notes that, even if the officers had an obligation to conduct "a minimal further investigation," it is far from clear that driving from Brooklyn Park to Monticello, retrieving the video from New River, bringing the video back to Brooklyn Park, and watching the video qualifies as "minimal." *See, e.g., Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 817-18 (8th Cir. 2010) (probable cause supported arrest, even assuming that officer who ordered arrest did not speak to the only eyewitness to the alleged crime); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996) (officers not required to investigate suspect's alibi before arresting him, even though some witness testimony suggested that suspect was innocent).

In light of *Clayborn* and similar Eighth Circuit precedent, the Court finds that a reasonable officer in the position of the officers who arrested Yang could have concluded that the arrest was supported by probable cause. Yang's claim that he was arrested in violation of the Fourth Amendment is therefore barred by the doctrine of qualified immunity, and defendants are entitled to summary judgment on that claim.

2.  Continued Detention

Like a warrantless arrest, pretrial detention—or continued pretrial detention—is lawful only if supported by probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 120 (1975). As defendants conceded at oral argument, the law is clearly established that someone may not be kept in jail simply because he might be related to a person who is suspected of committing a crime. No reasonable officer could believe otherwise.

On January 23, Detective Thomas looked at the surveillance video and still shots from the video and told Sergeant Erickson that the suspect was not Yang. Yet Yang was nevertheless kept in jail for a second night. Viewing the record in the light most favorable to Yang, the *only* reason for the continued detention was that Sergeant Erickson concluded that Yang might be related to the suspect depicted on the surveillance video. (This conclusion was apparently based on the fact that both Yang and the suspect were Asian; the record suggests no other basis for Sergeant Erickson's conclusion.) Detective Thomas's affidavit is clear on this point: According to that

affidavit, Sergeant Erickson told Detective Thomas "to keep Yang in custody because the man in the video could be related to Yang." Thomas Aff. at 4. If this is true, the continued detention plainly violated Yang's rights under the Fourth Amendment.[4]

In arguing to the contrary, defendants rely on *Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001), and *Baker v. McCollan*, 443 U.S. 137 (1979). Both cases are easily distinguishable.

In *Young*, the plaintiff (Willie Mae Young) was arrested on a Saturday afternoon pursuant to an arrest warrant. 249 F.3d at 732. The intended target of the warrant was Young's sister-in-law, who sometimes used Young's name as an alias. *Id.* Later that day, the officer who had arrested Young saw a physical copy of the arrest warrant with a photograph of Young's sister-in-law attached. *Id.* He suspected that the person he had arrested was not the person depicted in the photograph. *Id.* The arresting officer told a supervisor, who instructed the officer to contact the detectives' office. *Id.* The detectives' office told the arresting officer to wait until a judge could decide what to do on Monday morning. *Id.* On Monday morning, a judge determined that Young should not have been arrested and ordered her released. *Id.* Young sued. The Eighth Circuit ultimately found that the officers were entitled to qualified immunity, even though they "might well" have violated the Fourth Amendment. *Id.* at 735.

---

[4]Detective Donahue is nevertheless entitled to qualified immunity because there is no evidence that he was involved in the decision to continue to detain Yang.

*Young* is distinguishable from this case in two important ways.  First, in *Young*, the information that had come to the arresting officer's attention did not clearly negate probable cause; to the contrary, "there was reason to question whether a mistake had been made, but the situation was equivocal." *Id.* at 735.  Here, viewing the facts in the light most favorable to Yang, there was nothing "equivocal" about the situation.  The caller who made the bomb threat was captured on video, and defendants concluded that the caller was not Yang.  Yang was not detained because "there was reason to question whether a mistake had been made," *id.*; he was detained because Sergeant Erickson thought he might be related to the caller.

Second, the plaintiff in *Young* had been arrested pursuant to an arrest warrant.  Because a judge had ordered the arrest, the officers were understandably reluctant to release the plaintiff before clearing it with the judge.  Here, however, no judge ordered that Yang be arrested.  That was the idea of Brooklyn Park police officers—and there is no reason why those same officers could not have released Yang after they realized that he was not the culprit.  Indeed, when Yang was finally released (one day too late), no one first sought a judicial determination.

*Baker* is also distinguishable.  In that case, Dallas officers arrested the plaintiff pursuant to a Potter County arrest warrant that was intended for his brother but mistakenly issued in his name.  443 U.S. at 141.  After four days, the Dallas police

department transferred the plaintiff to the custody of the Potter County sheriff. *Id.* Three days later, the sheriff released the plaintiff after learning of the mistake. *Id.* The Supreme Court held that the sheriff had not violated the plaintiff's constitutional rights by keeping him in the Potter County jail for three days before discovering the mistake. *Id.* at 142-47.

Clearly, *Baker* is a much different case. There, the plaintiff argued that law-enforcement officers violated his constitutional rights by detaining him *before* they learned that he had not committed any crime. *Id.* at 142. Here, Yang argues that law-enforcement officers violated his constitutional rights by detaining him *after* they learned that he had not committed any crime. The question of how quickly officers must conduct an investigation to determine whether the correct person has been arrested is obviously much different from the question of whether officers may keep a person in custody after they have determined that he did not commit a crime.

In sum, viewing the facts in the light most favorable to Yang, Sergeant Erickson and Detective Thomas violated the Fourth Amendment when they continued to detain Yang after they determined that he had not called in the bomb threats. Because no reasonable officer could have concluded that the continued detention of Yang was lawful, neither officer is entitled to qualified immunity.

### 3. *Monell* Claims

Brooklyn Park cannot be held vicariously liable under 42 U.S.C. § 1983. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978)). Instead, Yang must prove that the violation of his constitutional rights resulted from (1) an official municipal policy; (2) an unofficial municipal custom; or (3) a deliberately indifferent failure by Brooklyn Park to train or supervise its officers. *See Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013).

Yang conceded at oral argument that he has no evidence that any violation of his Fourth Amendment rights resulted from any such policy, custom, or deliberate indifference. Brooklyn Park is therefore entitled to summary judgment on Yang's federal claims.

### C.  State Claims

Yang also brings state-law claims for false arrest and false imprisonment. Under Minnesota law, as under federal law, a warrantless arrest and subsequent detention must be supported by probable cause. *Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn. 1990).

#### 1.  Individual Officers

"Under Minnesota law, official immunity protects police officers engaged in law enforcement efforts unless they act with subjective malice." *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006). The term "subjective malice" is somewhat misleading. An

official has acted with "subjective malice" when "the official has intentionally committed an act that he or she had *reason to believe* is prohibited." *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571-72 (Minn. 1994) (emphasis added). This "contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions." *Id.* at 571; *see also Smith v. City of Brooklyn Park*, 757 F.3d 765, 775 (8th Cir. 2014) (quoting *Beaulieu*); *Smith v. City of Minneapolis*, 754 F.3d 541, 549 (8th Cir. 2014) (same); *Loch v. City of Litchfield*, 689 F.3d 961, 968 (8th Cir. 2012) (same).

Both parties agreed at oral argument that, under the circumstances of this case, official-immunity analysis under Minnesota state law does not differ in any material respect from qualified-immunity analysis under federal law. Thus, the defendant officers are entitled to summary judgment on Yang's state-law claim relating to his arrest; the Court has already held that the officers acted reasonably in arresting Yang. But Sergeant Erickson and Detective Thomas are not entitled to summary judgment on Yang's state-law claim relating to his continued detention; on Yang's version of the facts, that arrest was "not legally justifiable" and therefore constituted false imprisonment under Minnesota law. *Kleidon v. Glascock*, 10 N.W.2d 394, 397 (Minn. 1943) (quotation marks omitted).

2.  Brooklyn Park

Under Minnesota law, municipalities "may be liable for the torts of their officers, employees, or agents acting within the scope of their employment under the doctrine of respondeat superior." *Watson by Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 414 (Minn. 1996) (citing Minn. Stat. § 466.02). But when "official immunity protects the government employee . . . from suit, the government entity will not be liable for its employee's torts under the statute or under common law respondeat superior." *Id.*

Here, official immunity protects the defendant officers from liability on Yang's state-law claim relating to his arrest, and thus Brooklyn Park is entitled to summary judgment on that claim. But Brooklyn Park is not entitled to summary judgment on Yang's state-law claim relating to his continued detention, because Sergeant Erickson and Detective Thomas are not entitled to official immunity on that claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendants' motion for summary judgment [ECF No. 26] is GRANTED IN PART AND DENIED IN PART as follows:

1. The motion is GRANTED as to defendant Chris Donahue. All claims against Donahue are DISMISSED WITH PREJUDICE AND ON THE MERITS.

2. The motion is GRANTED as to defendants Jeffrey Thomas (formerly known as Jeffrey Tomaszewski) and Marcus Erickson with respect to plaintiff's federal and state claims challenging the legality of his arrest on January 22, 2013. Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. The motion is GRANTED as to defendant City of Brooklyn Park with respect to all of plaintiff's federal claims and with respect to plaintiff's state claim challenging the legality of his arrest on January 22, 2013. Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

4. The motion is DENIED in all other respects.

Dated: July 6, 2016          s/Patrick J. Schiltz
                             Patrick J. Schiltz
                             United States District Judge